UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,

        v.

DEANDRE WILSON,

        Defendant.

**DECISION AND ORDER**

1:19-CR-00155 EAW

───────────────────────────────

## **INTRODUCTION**

During the course of the trial of defendant Deandre Wilson ("Wilson"), defense counsel sought to call as a witness Richard Brady ("Brady"), an individual currently in the custody of the New York State Department of Corrections and Community Supervision who testified before the grand jury on December 18, 2019. Pursuant to an Order issued by the Court (Dkt. 563),[1] Brady was brought to Court on October 27, 2022, but after consultation with assigned counsel he refused to testify or answer any questions, invoking his Fifth Amendment right against self-incrimination. As a result, Wilson sought to introduce portions of Brady's grand jury testimony pursuant to Federal Rules of Evidence 613(b), 804(b)(1), and 804(b)(3). The Court denied Wilson's request. This Decision and Order memorializes the Court's reasons for that denial.

───────────────────────────────

[1]    The Court issued writs of habeas corpus ad prosequendum to procure Brady's attendance (Dkt. 540; Dkt. 541), but he refused transport. The Court subsequently issued orders directing the use of reasonable force to procure Brady's attendance. Brady was produced on October 27, 2022, pursuant to the Order issued on October 26, 2022. (Dkt. 563).

- 1 -

## BACKGROUND

Familiarity with the factual and procedural background of this matter, including the evidence presented at trial, is assumed for purposes of this Decision and Order. The Court briefly summarizes certain salient information below.

On September 25, 2019, co-defendant James Reed a/k/a Fatts ("Reed") was charged by way of a superseding indictment with one count of a narcotics conspiracy in violation of 21 U.S.C. § 846 and one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. (Dkt. 14). Wilson was not named in the superseding indictment.

Brady, who was on state parole and had fled the state, was apprehended in Cleveland, Ohio, on October 23, 2019. (*See* Dkt. 539 at 1). It is undisputed that Brady and Reed encountered one another while detained at the Niagara County Jail. On December 17, 2019, Brady entered into a proffer agreement with the government, and the following day he testified before the grand jury. Brady testified that he had been involved in drug trafficking in the past. (GJ Tr. at 5).² He then testified that he had known Reed since they were children and that they both lived in Riverside and went to the Boys and Girls Club together. (Dkt. 561-1 at 6).³ Brady stated that he had purchased drugs from

---

² The grand jury transcript of Brady's testimony was provided to the Court and defense counsel, but other than the specific portions that Wilson sought to admit pursuant to Federal Rules of Evidence 804(b)(3) and 613(b) (*see* Dkt. 561-1), the entirety of the transcript is not on the docket. Accordingly, the Court will reference those portions of the grand jury transcript that are not filed on the docket as "GJ Tr.".

³ When referencing the portions of Brady's grand jury testimony that is filed on the docket, the Court will use the transcript pages as opposed to the CM/ECF pagination.

Reed on and off since 1999, that the last time he had purchased drugs from Reed was in September of 2019, and that at that time he had been continuously purchasing drugs from Reed since approximately 2016. (Dkt. 561-1 at 7; GJ Tr. at 7-8). Brady detailed how his dealings with Reed worked, including that he would use text messages to arrange meetings. (GJ Tr. at 8-14).

Brady further testified that he would sometimes store drugs or weapons for Reed at a house that Brady rented on Royal Street during the summer of 2019. (*Id*. at 17-18). According to Brady, Reed would give Brady money for rent and Brady provided Reed with a key to the house. (*Id*. at 20). Brady testified that in September of 2019, Reed gave him a small cooler containing a kilogram of cocaine, a "[Chevrolet] HHR booklet with a manual in it," a ring, a necklace with an "M" pendant,[4] and two debit cards with female names, one of which had the name "Nicole" on it. (Dkt. 561-1 at 24-26; GJ Tr. at 24-27). Brady stated that the kilogram of cocaine was wrapped in newspaper that appeared to be in a language other than English, and that it might have been Spanish, but he could not be sure. (Dkt. 561-1 at 25).

Brady further testified that he encountered Reed at the Niagara County Jail after his apprehension in October of 2019. (*Id*. at 30-31). According to Brady, he was sitting at a poker table with some other people from his neighborhood when Reed came up, put his hands on the table, looked at Brady, and said, "you're late, man." (*Id*. at 31). Brady

---

[4] The government maintains that there is an error in the grand jury transcript and that Brady actually referenced an "N" pendant. (Dkt. 539 at 4 n.3).

testified that Reed then asked, "where is my bread at, bro?", after which they both started laughing and walked away to talk. (*Id.*).

The government determined that it did not find Brady's testimony before the grand jury credible and that it would not pursue his cooperation any further. Brady did not ultimately receive any benefit from his proffer agreement.

Approximately eight months after Brady's grand jury testimony, by second superseding indictment returned on August 26, 2020, Wilson was charged with: narcotics conspiracy in violation of 21 U.S.C. § 846 (Count 1); Hobbs Act conspiracy in violation of 18 U.S.C. § 1951(a) (Count 8); Hobbs Act robbery in violation of 18 U.S.C. §§ 1951(a) and 2 (Count 9); murder while engaged in a narcotics conspiracy in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2 (Count 10); discharge of a firearm in furtherance of a crime of violence and drug trafficking crimes in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2 (Count 11); discharge of a firearm causing death in furtherance of a crime of violence and drug trafficking crimes in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j)(1) and 2 (Count 12 and Count 13); conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k) (Count 14); obstruction of justice in violation of 18 U.S.C. §§ 1512(c)(1) and 2 (Count 15 and Count 16); conspiracy to use fire to commit a felony in violation of 18 U.S.C. §§ 844(m) (Count 17); use of fire to commit a felony in violation of 18 U.S.C. §§ 844(h) and 2 (Count 18 and Count 19); conspiracy to damage and destroy a vehicle used in interstate commerce by fire in violation of 18 U.S.C. § 844(n) (Count 20); damaging and destroying a vehicle used in interstate commerce by fire in violation of 18 U.S.C. §§ 844(i) and 2 (Count 21); maintaining a drug-involved premises in violation of 21 U.S.C.

§ 856(a)(1) and 18 U.S.C. § 2 (Count 23); and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D), and 18 U.S.C. § 2 (Count 24). (Dkt. 106). Several of these counts involved the murders of Miguel Anthony Valentin-Colon ("Miguel"), Nicole Marie Merced-Plaud ("Nicole"), and Dhamyl Roman-Audiffred ("Dhamyl").

Wilson's trial began with jury selection commencing on September 21, 2022, and the presentation of proof commencing on September 27, 2022. (Dkt. 488; Dkt. 499). Reed was a cooperating witness on the government's behalf at Wilson's trial. Reed testified that on September 15, 2019, his brother and co-defendant Jariel Cobb ("Cobb") asked him to come with him to count drug money. (Dkt. 536 at 108).[5] According to Reed, he, Cobb, and Wilson went to a house at 4 Roebling Avenue owned by an individual named Brandy to do a drug deal. (*Id*. at 122-26). Reed gave testimony implicating Wilson in the murders of Miguel, Nicole, and Dhamyl during that drug deal. (*See generally* Dkt. 536; Dkt. 537).

On cross-examination, defense counsel asked Reed if he had met Brady at the Boys and Girls Club in Riverside. (Dkt. 537 at 71). Reed replied that he had never met Brady except in jail. (*Id*.). Reed denied ever having sold drugs to Brady. (*Id*. at 71-72). According to Reed, he met Brady at the Niagara County Jail, where they played poker together, and they never discussed anything about this case apart from what had been on the news. (*Id*. at 72). Defense counsel initially indicated that they intended to ask Reed additional questions about Brady's grand jury testimony, but ultimately opted not to pursue

---

[5] The page references to Reed's trial testimony are to the CM/ECF generated page numbers, not the transcript pagination.

the matter. Defense counsel further represented that they did not intend to call Brady as a witness.

Defense counsel later reversed course with respect to calling Brady as a witness. The government noted that Brady's grand jury testimony implicated himself in criminal conduct, and that the government also believed he had committed perjury. The government stated that it would not immunize Brady from prosecution were he to take the stand. The Court accordingly determined that counsel should be appointed to Brady. The Court further heard argument and the parties submitted briefing (Dkt. 539; Dkt. 560; Dkt. 561) regarding whether any portion of Brady's grand jury testimony should be admitted into evidence in the event he invoked his Fifth Amendment right against self-incrimination.

On October 27, 2022, Brady was brought before the Court. The Court appointed counsel to Brady and afforded him an opportunity to speak with his attorney. After consulting with his attorney, Brady invoked the Fifth Amendment and declined to answer any questions. The parties agreed that there was no basis to challenge Brady's invocation of the Fifth Amendment. The Court accordingly heard additional argument on whether any portion of Brady's grand jury testimony was admissible under any of Federal Rules of Evidence 613(b), 804(b)(1), or 804(b)(3). The Court ultimately determined that it was not, and no portion of Brady's grand jury testimony was presented to the jury.

# DISCUSSION

I. **Due Process and the Availability of Brady as a Witness**

As an initial matter, defense counsel argued on the record on October 27, 2022, that the government might have violated Wilson's right to due process by raising the possibility that Brady could open himself up to criminal prosecution by testifying and declining to immunize him. In support of this contention, defense counsel cited *United States v. Foster*, 128 F.3d 949 (6th Cir. 1997), wherein the Sixth Circuit observed that "government conduct which amounts to substantial interference with a witness' free and unhampered determination to testify will violate due process." *Id*. at 953. In particular, in *Foster*, the government had threatened to revoke a witness's immunity and prosecute him if he testified at the defendant's trial. *Id*. at 954.

*Foster* is inapposite here. *Foster* involved a witness who consistently provided exculpatory evidence in favor of the defendant, who was represented by counsel, and whose attorney was contacted by the prosecution just days before the defendant's trial and advised that immunity would be revoked if the witness testified at the trial. *Id*. at 953-54. Unlike the witness in *Foster*, Brady was not represented by counsel at the time the defense indicated their intention to call him to testify, nor had he been advised by the government during the grand jury proceeding that it believed he was committing perjury. *See Foster*, 128 F.3d at 954 ("[The witness] had already given testimony before a grand jury in which he denied [the defendant's] involvement in dealing drugs. At that grand jury hearing, the government repeatedly made it clear to [the witness] that it believed he was lying and that his testimony could subject him to perjury charges. Nonetheless, [the witness] continued

- 7 -

to deny any knowledge of [the defendant's] involvement in distributing drugs. Given this exchange and the fact that [the witness] had his own counsel, it would seem clear that he had an understanding of the consequences that would accompany false testimony."). Accordingly, some discussion of the potential criminal consequences to Brady was unavoidable, in order to alert the Court to the necessity of appointing counsel. This initial conversation, notably, did not occur in either the presence of Brady or his subsequently appointed lawyer, and there is no indication that the kind of direct threats at issue in *Foster* occurred here.

Moreover, the Second Circuit has made clear that "[t]he government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized." *United States v. Ebbers*, 458 F.3d 110, 118 (2d Cir. 2006). The government is required to grant immunity only under "extraordinary circumstances," and the burden is on the defendant to show that: (1) "the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation"; and (2) "that the evidence to be given by an immunized witness will be material, exculpatory and not cumulative and is not obtainable from any other source." *United States v. Stewart*, 907 F.3d 677, 685 (2d Cir. 2018) (citations omitted). "[T]he situations in which conferring immunity would be required are so few and exceptional that [the Second Circuit has] yet to reverse a failure to immunize."

*United States v. Melendez*, No. 20-3876-CR, 2022 WL 3640449, at *4 (2d Cir. Aug. 24, 2022) (quoting *Stewart*, 907 F.3d at 685).

Wilson did not even attempt to demonstrate that this standard was satisfied here, nor could he have done so successfully. The record is devoid of any evidence that the government engaged in discriminatory use of immunity or that it engaged in overreaching—which the Second Circuit has noted "can be shown through the use of threats, harassment, or other forms of intimidation," *Stewart*, 907 F.3d at 686 (quotation omitted)—or tactical manipulation.

For all these reasons, the Court rejected defense counsel's due process argument.

## II. Rule 804(b)(1)—Former Testimony

The Court turns next to the defense's contention that Brady's grand jury testimony was admissible under Rule 804(b)(1), which provides:

> **(b) The Exceptions.** The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> **(1) Former Testimony.** Testimony that:
>
> **(A)** was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> **(B)** is now offered against a party who had — or, in a civil case, whose predecessor in interest had — an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Fed. R. Evid. 804(b)(1). "The proponent of a hearsay statement bears the burden of demonstrating its admissibility." *United States v. Mendlowitz*, No. S2 17 CR. 248 (VSB), 2019 WL 6977120, at *9 (S.D.N.Y. Dec. 20, 2019).

An individual who has properly invoked the Fifth Amendment is unavailable within the meaning of Rule 804. *See United States v. Miller,* 954 F.3d 551, 561 (2d Cir. 2020) ("When a witness properly invokes his Fifth Amendment right against self-incrimination, he is unavailable for the purposes of Rule 804(a)."), *cert. denied sub nom. Mack v. United States*, 141 S. Ct. 2806 (2021). Further, the testimony at issue was given when Brady was a witness before the grand jury, thus satisfying the requirements of subparagraph (A) of Rule 804(b)(1). Accordingly, the question before the Court was whether subparagraph (B) was satisfied—in other words, whether the government had "an opportunity and similar motive" to develop Brady's testimony during the grand jury proceeding as it did during trial.

"[T]he inquiry as to similar motive must be fact specific, and the grand jury context will sometimes, but not invariably, present circumstances that demonstrate the prosecutor's lack of a similar motive." *United States v. DiNapoli*, 8 F.3d 909, 914 (2d Cir. 1993). In assessing the similarity of the motives:

> [The Court considers] whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue. The nature of the two proceedings—both what is at stake and the applicable burden of proof—and, to a lesser extent, the cross-examination at the prior proceeding—both what was undertaken and what was available but forgone—will be relevant though not conclusive on the ultimate issue of similarity of motive.

*Id*. at 914-15. The Second Circuit has observed that a prosecutor's motives at the grand jury and the trial may be dissimilar for multiple reasons:

> [B]ecause of the low burden of proof at the grand jury stage, even the prosecutor's status as an "opponent" of the testimony does not necessarily

> create a motive to challenge the testimony that is *similar* to the motive at trial. . . . Moreover, the grand jury context will sometimes present additional circumstances that render the prosecutor's motive to challenge the exonerating testimony markedly dissimilar to what the prosecutor's motive would be at trial. Frequently the grand jury inquiry will be conducted at a time when an investigation is ongoing.

*Id*. at 913; *see also United States v. Whitman*, 555 F. App'x 98, 103 (2d Cir. 2014) ("In *DiNapoli*, we held that a prosecutor does not have the same motive when questioning a witness before a grand jury as when cross-examining a witness at a later trial, because a prosecutor uses the grand jury to investigate possible crimes and identify possible criminals, and thus, unlike at trial, has little incentive to undermine an unhelpful witness's credibility." (quotation and alteration omitted)).

Here, at the time Brady testified before the grand jury, the investigation into the murders of Miguel, Nicole, and Dhamyl was ongoing, and no one had been charged in connection therewith. In other words, the prosecutor was "using the grand jury to investigate possible crimes and identify possible criminals," and thus cannot be said to have been an "opponent" of Brady's version of events. *DiNapoli*, 8 F.3d at 913. Simply put, the government did not have "a motive to show the falsity of the testimony" similar to its motive at trial, where an indictment had been returned charging Cobb and Wilson with the murders and Reed, Cobb, and Wilson with its coverup, especially where Brady's testimony was going to be "presented by a defendant to rebut the prosecutor's evidence of guilt." *Id*. The lack of similar motive is amply demonstrated by the fact that before the grand jury, the prosecutor did not press Brady on his version of events nor engage in any questioning remotely akin to cross-examination. The Court notes in particular that there

had been widespread media coverage related to the murders, and yet Brady was not pressed as to what information he might have gleaned from those news reports.

On this record, the Court concluded that the similar motive requirement under Rule 804(b)(1) was not satisfied. Accordingly, Brady's grand jury testimony was not admissible on this basis. *See United States v. Salerno*, 505 U.S. 317, 322 (1992) ("We see no way to interpret the text of Rule 804(b)(1) to mean that defendants sometimes do not have to show 'similar motive.'").

### III.     Rule 804(b)(3)—Statement Against Penal Interest

The Court turns next to the defense's contention that portions of Brady's grand jury testimony were admissible under Rule 804(b)(3) as statements against his penal interest. The Court notes as an initial matter that because the Rule 804(b)(3) analysis is done on a statement-by-statement basis, *see United States v. Ojudun,* 915 F.3d 875, 886 (2d Cir. 2019) (explaining that a court must "focus on each of [the] statements individually to determine which of them would reasonably have been viewed as so exposing [the declarant] to criminal liability as to fall within Rule 804(b)(3)(A)"), it required defense counsel to identify by page and line number the specific sections of Brady's grand jury testimony it was seeking to admit. Defense counsel identified the following: page 6, lines 17-25; page 7, lines 17-20; page 24, lines 4-25; page 25, lines 1-16; page 26, lines 3-16; page 30, lines 19-25; and page 31, lines 1-25. (Dkt. 561-1).

Rule 804(b)(3) permits the admission of:

A statement that:

**(A)** a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

**(B)** is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). "The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true, and this question can only be answered in light of all the surrounding circumstances." *Williamson v. United States*, 512 U.S. 594, 603-04 (1994).

Here, the Court considered whether each individual statement identified by the defense was against Brady's penal interest. As to page 6, lines 17-25, defense counsel conceded during oral argument on October 27, 2022, that these statements about Brady having met Reed when they were children were not against Brady's penal interest.

Turning next to page 7, lines 17-20; page 24, lines 4-25; page 25, lines 1-16; and page 26, lines 3-16, these statements all discuss the incident in September of 2019, in which Brady allegedly received from Reed a cooler containing a kilogram of cocaine, debit cards, and jewelry. Defense counsel argued that these statements were against Brady's penal interest because they implicated him in acquiring cocaine and possessing stolen property. The Court disagrees.

As to the kilogram of cocaine, Brady had already stated earlier in his grand jury testimony that he was involved in drug trafficking. His subsequent statement that he had received cocaine from Reed was far more inculpatory of Reed than it was of himself. "[A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest[.]" *United States v. Tropeano*, 252 F.3d 653, 658 (2d Cir. 2001) (quoting *Williamson*, 512 U.S. at 603). It is relevant to this analysis that Brady was testifying pursuant to a proffer agreement, under which with some exceptions, none of his statements could be directly used against him in a subsequent criminal prosecution. The circumstances taken as a whole strongly indicate that Brady's statements implicating Reed as his drug supplier were not self-inculpatory, but were instead an attempt by Brady to gain a benefit for himself by providing the government with information regarding a crime of far more interest than Brady's own offenses. In other words, a reasonable person in Brady's position would have had ample motivation to make the statements at issue even if they were not true. *See Williamson*, 512 U.S. at 604 ("A reasonable person in [the declarant's] position might even think that implicating someone else would decrease his practical exposure to criminal liability[.]").

As to Brady's statements that Reed gave him jewelry and two debit cards, in addition to the reasons already discussed, there is nothing to suggest that Brady knew at the time he allegedly received these items that they were stolen property. There is nothing illegal, without more, about holding two debit cards and some jewelry for an associate, and so the Court cannot conclude that these statements were self-inculpatory.

Brady's statements about his alleged receipt of these items from Reed also were not accompanied by the necessary corroborating circumstances. The Second Circuit has made clear that the corroborating circumstances must "clearly indicate both the declarant's trustworthiness and the truth of the statement." *Ojudun*, 915 F.3d at 887 (quotations and citations omitted). "For those conditions to be satisfied, 'the inference of trustworthiness from the proffered "corroborating circumstances" must be strong, not merely allowable.'" *Id*. (quoting *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir. 1987)). Here, as to Brady's trustworthiness, the sole fact relied upon by the defense was that Brady was under oath before the grand jury. While that is certainly a factor in the Court's analysis, it does not, when considered in light of all the circumstances, create a strong inference of trustworthiness. In particular, the Court notes again that Brady was testifying pursuant to a proffer agreement that generally prevented the direct use of any of his statements against him in a subsequent criminal prosecution. Moreover, Brady has a long criminal history that includes multiple crimes of dishonesty (including possession of a forged instrument, scheme to defraud, and identity theft). (*See* Dkt. 539 at 14-15).

There are also portions of Brady's statement that the defense did not seek to admit that are entirely inconsistent with the evidence of record, thus severely undercutting any inference of trustworthiness on Brady's part. For example, Brady claimed that Reed had told him Cobb had hogtied Miguel and raped Nicole in front of him (GJ Tr. at 33), but the medical examiners and forensic experts did not testify to any corresponding injuries. Brady also claimed Reed had told him the murders had occurred at a "weed house" on "Box and Kehr" (*id*.), but that is not where the murders took place. Brady further testified that Nicole

was the niece of an individual whom Reed had met in federal prison and for whom Reed was "plugging coke" (*id*. at 34-35), and that Reed and Cobb had staged it to appear as though Dhamyl had robbed Miguel and Nicole (*id*. at 37), but none of these statements were consistent with the evidence at trial. Brady's claim that he communicated with Reed via text message was also not borne out by the phone records obtained by the government. In other words, the circumstances as a whole do not support the conclusion that Brady was trustworthy.

There were also not corroborating circumstances to clearly indicate the truth of the particular statements sought to be admitted. Defense counsel pointed to the fact that Brady said the kilogram of cocaine he received from Reed was wrapped in newspaper that was in a different language (possibly Spanish). (Dkt. 561 at 5). Defense counsel further pointed out that there were two kilograms of cocaine obtained from the hotel where the victims were staying that were wrapped in Spanish-language newspaper and that Cobb testified at trial that he never bought fewer than three kilograms of cocaine at a time from the victims. (*Id*.). Thus, the argument goes, the kilogram allegedly given to Brady by Reed is the "third" kilogram that was supplied by the victims. However, there was no evidence in the record that the cocaine the victims brought to 4 Roebling Avenue on the night of their murders was wrapped in newspaper, nor that this was a unique or distinctive manner of packaging drugs.

Moreover, there were many aspects of Brady's statement that were wholly uncorroborated with the evidence of record. There was no evidence that the victims delivered cocaine to 4 Roebling Avenue in a cooler. There was no evidence that any debit

cards were taken from the victims. The only evidence of record regarding a necklace was that a necklace with an "N" pendant had been recovered with Nicole's body—and notably, a picture of Nicole that had been widely circulated in the media showed her wearing that necklace. There was also no evidence of a missing ring. For all these reasons, the Court concluded that Brady's statements regarding his alleged receipt from Reed in September 2019 of a cooler containing cocaine, debit cards, and jewelry, were neither against Brady's penal interest nor accompanied by the necessary corroborating circumstances.

The Court turns finally to the statements found on page 30, lines 19-25, and page 31, lines 1-25. Defense counsel conceded at oral argument that these statements—which recount an interaction between Brady and Reed at the Niagara County Jail—were not against Brady's penal interest.

In sum, none of the statements identified by the defense in Brady's grand jury testimony were admissible under Rule 804(b)(3).

## IV. Rule 613(b)—Extrinsic Evidence of a Prior Inconsistent Statement

Rule 613(b) permits the admission of extrinsic evidence of a witness's prior inconsistent statement for impeachment purposes, "if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b). Importantly, "the rule does not apply to impeachment by evidence of prior inconsistent conduct." Fed. R. Evid. 613, Advisory Committee Notes; *see also United States v. Praetorius*, 622 F.2d 1054, 1065 (2d Cir. 1979) ("The advisory committee note to the rule provides that the rule does not apply to evidence of prior inconsistent conduct.").

The defense contended that portions of Brady's grand jury testimony were admissible under Rule 613(b) in order to impeach Reed. However, as the Court explained on the record on October 27, 2022, Rule 613(b) applies to a witnesses' prior inconsistent statements—not testimony by an entirely different witness that conflicts with the witnesses' version of events. The portions of Brady's grand jury testimony identified by the defense contained only two alleged prior statements by Reed: "you're late, man," and "where is my bread at, bro?" (*See* Dkt. 561-1 at 31). Initially, the Court notes that while Wilson sought to introduce Reed's statements to Brady for impeachment purposes under Rule 613(b) and not for their truth, Wilson was seeking to introduce the statements by Brady to the grand jury for their truth, and yet Wilson identified no basis under the hearsay rules for the admissibility of Brady's statements to the grand jury. *See United States v. Cruz*, 894 F.2d 41, 44 (2d Cir. 1990) ("Each hearsay statement within multiple hearsay statements must have a hearsay exception in order to be admissible."). In other words, even if Reed's statements to Brady were admissible under Rule 613(b), there would need to be a hearsay exception applicable to Brady's statements to the grand jury. There is not.

In any event, the identified statements are not inconsistent on their face with Reed's trial testimony. *See United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir. 1988) ("[T]he determination of whether statements are in fact inconsistent is committed to the sound discretion of the district court[.]"). Reed testified that he spoke to Brady in the Niagara County Jail and that he played poker with Brady. Brady's testimony that Reed said to him,

"you're late, man" and "where is my bread at, bro?" is not, on its face, inconsistent with Reed's testimony.[6]

Additionally, "a trial court's broad discretion in controlling the mode and order of interrogating witnesses and presenting evidence, permits it to exclude extrinsic impeachment evidence that was not revealed while the witness was on the stand, or at least before the witness was permitted to leave the court[.]" *United States v. Surdow*, 121 F. App'x 898, 899 (2d Cir. 2005) (quotation and citations omitted). Here, defense counsel did not question Reed about these particular prior statements to Brady while he was on the witness stand, nor raise any request to do so. Accordingly, the Court would have been obliged to recall Reed to the stand to allow him the requisite "opportunity to explain or deny the statement," Fed. R. Evid. 613(b), which it did not find would be appropriate under the circumstances.

For all these reasons, the Court found that the identified portions of Brady's grand jury testimony were not admissible to impeach Reed pursuant to Fed. R. Evid. 613(b).

## V. **Federal Rule of Evidence 403—Probative Value Substantially Outweighed**

Finally, the Court notes that even had any portion of Brady's grand jury testimony been admissible under one of the identified rules set forth above, the Court nevertheless found its probative value outweighed by the danger of confusing the issues, misleading the

---

[6] It is true that Brady was asked, "[w]hat do you think he meant by where is my bread at?" and replied that he thought Reed was referring to money that Brady owed him for the kilogram of cocaine from September of 2019. However, defense counsel conceded at oral argument that this question and answer could not come in even if Brady were on the stand. Accordingly, this aspect of Brady's grand jury testimony cannot be relied upon to transform this statement into one contrary to Reed's trial testimony.

jury, and unduly delaying the trial.  As the government noted in its submission to the Court, Brady has an extensive criminal history.  (*See* Dkt. 539 at 14-15).  And Federal Rules of Evidence 609 and 806, read in tandem, would have permitted the government to impeach Brady—as an unavailable declarant—through evidence of his prior convictions.  Further, the government would have sought to introduce the underlying facts of many of Brady's prior criminal offenses pursuant to Rule 608.  (*Id*. at 15).  This would have been extremely confusing for the jury, and would have run the risk of creating a trial within a trial over the credibility of a witness who never even appeared before them.

## CONCLUSION

For the foregoing reasons, the Court denied at trial Wilson's request to admit any portion of Brady's grand jury testimony into evidence.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:     November 21, 2022
           Rochester, New York